```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )         4:06CR3049
                               )
     v.                        )
                               )
ERIK OSORIO,                   )         REPORT, RECOMMENDATION,
                               )              AND ORDER
              Defendant.       )
                               )
```

The defendant has moved to suppress "any and all items of physical evidence, statements by defendant and observations made by police officers during the unlawful seizure of defendant and warrantless entry and search of defendant's home on or about February 7, 2006, by officers of the Lincoln Police Department." Filing 23.  The defendant claims he did not consent to the officers' search of his home, and that he was seized and subjected to custodial interrogation in violation of his Miranda rights.  He claims the evidence and statements obtained by the officers on February 7, 2006 must be suppressed because the "illegal and warrantless entry and search of [his] home and subsequent interrogation were conducted in violation of the 4th and 5th Amendments to the United States Constitution."  Filing 23, ¶ 3.

The evidentiary hearing on defendant's motion was conducted on July 11, 2006 and July 20, 2006.  The parties submitted post-hearing briefs after the hearing transcript was prepared and filed.  See filings 37 & 38.  The matter is now fully submitted.  Having considered the evidence and the parties' arguments, I conclude the defendant's motion to suppress should be denied.

FACTUAL FINDINGS

In February 2006, Investigator Forrest Dalton of the Lincoln Police Department's narcotics unit was tasked with investigating and "clearing up" old and accumulated Crime Stopper's reports received by the department.  On February 7, 2006, LPD Investigator James Sydik was assisting Investigator Dalton with completing the Crime Stoppers project.

One of the Crime Stoppers complaints under investigation was a July, 24, 2004 report that the defendant and another person had personally, and with the assistance of others, been selling cocaine and marijuana to Lincoln High School students since 1998. Investigators Dalton and Sydik went to Osorio's home on February 7, 2006 at approximately 2:00 p.m. to make contact with the defendant.  At that time, the defendant lived in an apartment on the 1800 block of "F" Street, in Lincoln, Nebraska with his girlfriend, Hortencia Paz, and their four-year-old daughter.

The investigators knocked on the apartment door, and Ms. Paz opened it.  Investigator Dalton asked Ms. Paz if the defendant was home, and she responded that he was and she would get him. This conversation was in English.  Investigator Dalton had no further communication with Ms. Paz on February 7, 2006.  After the defendant was ultimately arrested that day, Investigator Sydik attempted to question Ms. Paz, but stopped when she advised him that she had difficulty understanding English.

Ms. Paz closed the door at least partially and retreated into the apartment.  She went to the bedroom and awakened the defendant.  He got dressed and opened the apartment door a few minutes later.  The investigators identified themselves as police

2

officers and displayed their badges.  Neither investigator was wearing a uniform, and although both were armed, their weapons were not visible and were never drawn during the officers' encounter with the defendant at his apartment on February 7, 2006.  Investigator Dalton asked if the officers could step inside the apartment and speak with the defendant.  The defendant said, "yes" or "okay," and backed up to allow them through the front door, which provided direct access to the apartment living room.

   The defendant, Ms. Paz, and their daughter were all present in the living room when Investigator Dalton began to speak with the defendant.  Ms. Paz and the daughter moved in and out of the living room while the officers continued to speak with the defendant that afternoon.  Investigator Dalton told the defendant that police had received a Crime Stoppers report accusing him of selling illegal drugs to Lincoln High School students.  The investigator did not reveal the date of the report.  The defendant denied the accusation.  Investigator Dalton asked the defendant if he had ever sold drugs or used drugs.  The defendant responded that he had not sold drugs, but had used cocaine, methamphetamine, and marijuana.  In response to further questioning, the defendant stated he did not possess sale amounts of illegal drugs, but did have personal use marijuana in the apartment.

   When Investigator Dalton asked the defendant to retrieve the marijuana, the defendant asked the officer if he had a search warrant.  Investigator Dalton responded that he did not have a warrant, and the defendant again mentioned that a warrant was needed.

Investigator Dalton then described, in English, the options available to the defendant. The officer explained that since the defendant admitted he had marijuana in the apartment, the officer would contact his supervisor and a decision would be made concerning whether to apply for a search warrant. If the police decided to attempt to get a warrant, officers would stay at the apartment while that process occurred. The defendant, Ms. Paz, and their daughter could leave, in which case the officers would secure the apartment by locking it up and waiting outside; or they could remain in the apartment, in which case the officers would also remain in the apartment to assure that no evidence was destroyed or removed. Investigator Dalton explained the process for obtaining a warrant, including the fact that it would likely take several hours. He told the defendant that if the officers obtained a search warrant, they would search the apartment; if not, they would leave. Investigator Dalton explained that the officer's course of action was up to the defendant--he could refuse to consent to a search and require the police to obtain a warrant, or he could consent to the search of the apartment or hand over his drugs, which would be a much quicker option. The officer also explained that since the defendant admitted there were drugs in the apartment and a child was present, a child neglect investigation may be initiated depending on what was found in the apartment and where it was found. Though the testimony was conflicting, based on the credible evidence, I find that no officer ever stated that the defendant's daughter would be taken into state child protective services custody if the defendant refused to cooperate or consent to a search of the apartment.

Having been advised of his options, the defendant responded in English, "Go get a search warrant." He recanted his previous

admission, stated, "Well, I never said there was any marijuana in the house," and began conversing with Ms. Paz in Spanish. Investigator Dalton radioed for a marked unit to come to the scene and assist Investigator Sydik with securing the apartment. Having apparently heard and understood the officer's radio request, the defendant asked Investigator Dalton to wait a moment, spoke to Ms. Paz in Spanish, and then told the investigator, "No, he doesn't have to come.  I'll go get the stuff for you."

The defendant escorted the officers into the kitchen.  He opened the freezer door, grabbed a clear-covered Tupperware bowl containing suspected marijuana, and handed it to Investigator Dalton.  When the officer asked the defendant if he had more marijuana in the apartment, the defendant escorted the officers to a closet located between the kitchen and living room.  He opened the closet door, and retrieved a car stereo box containing several baggies of marijuana.  While the closet door was open, Investigator Dalton saw six boxes of nine millimeter ammunition in the closet.

Investigator Dalton asked for consent to search the rest of the apartment.  The defendant granted consent, and thereafter escorted and accompanied the officers throughout the apartment while the search was conducted. At the officers' request, Ms. Paz and the daughter remained in the living room during the search.  Officer Fitch, responding to Investigator Dalton's previous call for a marked unit at the scene, arrived at the outset of the search and was present in the apartment while the investigators performed the search.

Investigator Dalton asked the defendant if he had any scales in the apartment, and the defendant responded that he had a scale in a kitchen drawer.  During the search of the kitchen, a black electronic scale and some baggies were found in the bottom (broiler pan) drawer of the oven.  Investigator Dalton asked the defendant if he had a gun, and the defendant responded that a gun was located in a nightstand drawer in the bedroom.  The defendant and Investigator Sydik went to the bedroom to retrieve the gun. Investigator Sydik removed the ammunition in the gun and took it into possession for the remainder of the search.  During a later search of the bedroom, the investigators found a nine millimeter bullet on the floor and a magazine of nine millimeter ammunition in the nightstand drawer.

Investigator Dalton asked the defendant how he smoked marijuana.  The defendant stated he used rolling papers.  When asked where those papers were kept, the defendant stated he keeps them in his wallet.  The wallet was searched, and $930.00 in cash was found.

During the apartment search, the investigators also found a marijuana pipe, a couple of marijuana cigarettes, and a set of brass knuckles.

All communications between the investigators and the defendant at the apartment were in English.  The defendant was cooperative throughout, and his answers were responsive to the questions asked.  Though the defendant's primary language is Spanish, the officers understood the defendant's responses, and the defendant appeared to understand the officers' questions and comments.  The defendant was not handcuffed at any time during

the search, and his movements were not restricted.  He was never threatened.

The officers never advised the defendant or Ms. Paz that they could withdraw consent to search, and neither of them ever asked that the search be discontinued.  The defendant was never advised of his Miranda rights, or that he could refuse to answer or stop answering questions.

## LEGAL ANALYSIS

The defendant claims he did not voluntarily consent to the warrantless search of his home, and that the evidence derived from that search must be suppressed under the Fourth Amendment. He further states he was subjected to custodial interrogation while in his home, and the resulting incriminating statements were involuntary and obtained in violation of Miranda.  The defendant seeks to suppress the statements under the Fifth Amendment.

Investigators Dalton and Sydik conducted a "knock and talk" at the defendant's apartment--they knocked on the door and asked to enter the apartment to speak with the defendant.  The "knock and talk" method used by law enforcement does not violate the Fourth Amendment if a reasonable person would feel free to refuse to cooperate with the officer's request and terminate the encounter. United States v. Drayton, 536 U.S. 194, 202 (2002)(citing Florida v. Bostick, 501 U.S. 429 (1991)).  The reasonable person test is objective and is based upon whether an innocent person in the defendant's position would have felt compelled to allow the officer to enter his home, respond to the

officer's questions, and consent to the warrantless search.  See Drayton, 536 U.S. at 202.

"[A]n unconstitutional search occurs when officers gain visual access to a . . . room after an occupant opens the door not voluntarily, but in response to a demand under color of authority."  United States v. Conner, 127 F.3d 663 (8th Cir. 1997).  However, the Fourth Amendment is not implicated when the occupant of a home voluntarily responds to a knock at the door during normal waking hours.

Investigators Dalton and Sydik went to the defendant's home during the afternoon.  The initial encounter did not occur in an isolated area, but rather at an outside entry door of an apartment complex located near downtown Lincoln, Nebraska.  The officers did not demand entry into the defendant's home, and they were not visibly armed when they requested entry.  They asked to enter the apartment in English, but the defendant apparently understood the question because he not only answered "Yes" or "Okay" in response, but stepped back from the doorway to allow the officers into his living room.

Once the officers and defendant were inside the apartment, the officers asked questions about the Crime Stoppers tip.  The defendant's girlfriend and daughter were present in the apartment during this questioning.  The defendant answered the questions, but when asked to retrieve his marijuana located in the apartment, he refused and advised the officers they would need a warrant.  I conclude the defendant was not intimidated by the officers' presence or questioning, and under the totality of the circumstances presented, a reasonable person in the defendant's position would not have felt threatened, coerced, or compelled to

allow the officers access to his home or to answer questions concerning the Crime Stoppers report.

In response to Investigator Dalton's questioning, the defendant admitted there was marijuana in the apartment. Investigator Dalton asked for consent to search, and although the defendant initially denied consent, he later stated the officers could search the home without a warrant. The defendant claims this consent was involuntary.

A consent to search is voluntary "if it [is] 'the product of an essentially free and unconstrained choice by its maker,'" rather than "'the product of duress or coercion, express or implied.'" United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  The Eighth Circuit has summarized the analysis required in determining if a defendant voluntarily consented to a search.

> A court determines whether consent is voluntary under the totality of the circumstances.  The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual.  In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as

the search occurred.

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005)(internal citations omitted).  See also United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003).

The defendant is an adult.  His primary language is Spanish, but he can speak and understand English.  He was not alone in the apartment with the officers--his girlfriend and child were also present.  He was not handcuffed or restrained in any way.  The defendant initially refused consent to search and told the officers to get a warrant.  Such conduct indicates the defendant was aware of his right to refuse consent to a search and the officers' obligation to obtain a warrant in the absence of consent.  The defendant was not intimidated by the officers or their presence in his apartment.

After the defendant told Investigator Dalton that he would need a warrant to search the apartment, the investigator explained the defendant's options--he could either consent to the search or he could refuse to consent and the officers would secure the home and attempt to get a warrant.  Investigator Dalton also explained that child protective service may be contacted, depending on the quantity and location of any illegal drugs found.  The defendant claims these statement by Investigator Dalton coerced the defendant to consent to a search.

Once the defendant admitted to having marijuana in the apartment, the officers had probable cause to obtain a warrant to search the apartment.  Investigator Dalton's explanation of the options available to the defendant at that time was not misleading, unjustified, or impermissibly coercive under the Fourth Amendment.  United States v. Raines, 536 F.2d 796, 801

(8th Cir. 1976)(holding that officer's statement to the defendant that police would guard the house while he applied for a search warrant, and the defendant need not produce incriminating evidence without a warrant, did not render defendant's consent involuntary).

Moreover, although the defendant was advised that a child custody investigation may be initiated if drugs were found in the home, there is no evidence this statement was used to barter for defendant's consent. The officers neither expressly nor implicitly promised that a child welfare investigation would not be initiated if the defendant consented to a search. Investigator Dalton simply explained the child welfare implications of finding drugs in the apartment, and while this statement may have caused the defendant to be rightfully concerned about the consequences to his family if drugs were found, the potential impact on the defendant's child and girlfriend was the same irrespective of whether the drugs were discovered in a warrantless consensual search of the home or a search conducted pursuant to a warrant. The defendant may have feared losing his daughter, but that psychological pressure arose because he knew the officers would find drugs during the apartment search--a reasonable innocent person under such circumstances would not have felt threatened or coerced by the officer's truthful explanation of the possible role of child protective services when drugs are found in a home. Drayton, 536 U.S. at 202. See also United States v. Santiago, 428 F.3d 699, 705 (7th Cir. 2005)(holding that where agents did not threaten to take the defendant's child into Child Protective Services custody, but "may have indeed made the defendant think about the consequences to his family," defendant's concern for his family did not amount to psychological pressure sufficient to render

11

consent involuntary); United States v. Reed, 2006 WL 2252515, *10 (August 3, 2006)(holding that the defendant "may well have considered the risk a residence-based narcotics conviction might pose to her parental rights," but the difficulty of deciding whether to consent to a search under these circumstances does not render the consent involuntary).

The defendant consented to a search after hearing the officer radio for additional police assistance to secure the apartment. The defendant thereafter openly responded to the officer's questions and cooperated in locating the drugs, drug-related items, and weapons within the home. He never asked the officers to stop searching, and he never refused to assist with the search.

Under the totality of the circumstances, a reasonable officer would interpret the defendant's conduct and words to mean that the defendant had consented to the search and that the consent was voluntarily and knowingly given. I therefore conclude the defendant's motion to suppress based on the Fourth Amendment should be denied.

The defendant also claims that he was seized while in his home and his incriminating statements during that seizure and in response to police questioning must be suppressed under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436 (1966) requires that a suspect be warned of his rights under the Fifth Amendment prior to any interrogation while in custody. U.S. v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). However, during the search of the apartment and prior to his formal arrest, the defendant was not in custody, no custodial interrogation occurred, and Miranda warnings were not required.

> An interview with government agents in [a private home] simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding. Although the "focus" of an investigation may indeed have been on [the defendant] at the time of the interview in the sense that it was his [conduct] which was under scrutiny, he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding. Miranda implicitly defined "focus," for its purposes, as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

United States v. Beckwith, 425 U.S. 341, 347 (1976)(holding the defendant was not in custody for the purposes of Miranda where the officers conducted a "knock and talk," were permitted into the defendant's home, and questioned the defendant about his potential criminal conduct while seated around his kitchen table).

The defendant's statements to the officers during the entry and search of his home on February 7, 2006 were not the product of custodial interrogation performed in violation of Miranda. For the reasons already discussed regarding defendant's consent to search, I also find the defendant voluntarily responded to the officers' questions. I therefore conclude the defendant's statements to the officers in his home should not be suppressed under the Fifth Amendment.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), that the defendant's motion to suppress, filing 23, be denied.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

　　　　IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on October 23, 2006 for a duration of three trial days before the Honorable Richard G. Kopf.  Jury selection will be at the commencement of trial.

　　　　DATED this 19th day of September, 2006.

　　　　　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　s/ *David L. Piester*
　　　　　　　　　　　　　　　David L. Piester
　　　　　　　　　　　　　　　United States Magistrate Judge